KASHIWA, Circuit Judge,
with whom BALDWIN, BENNETT, and JACK R. MILLER, Circuit Judges, join, dissenting.
I respectfully dissent. I join Judge Bennett’s dissent. Since I believe we have jurisdiction in this case, I do not reach the transfer issue.[1]
The holding of the majority not only creates an illogical bid protest procedure but also encourages protective litigation by disappointed bidders. Neither result was intended by Congress. Rather, the purpose of the Federal Courts Improvement Act of 1982, Pub.L. No. 97-164, 96 Stat. 25 (the “Act”) is to improve “the administration of the law in the areas of patents, government contracts, merit system protection, trademarks and international trade”[2] and “to improve the quality of our Federal court system and to enhance citizen access to justice.”[3]
The majority today, for the first time, draws a distinction between jurisdiction and *1380 power that I find most unusual. I have not only never seen this distinction before but I believe it to be incorrect based upon prior law. It is a distinction without a difference. The majority argues that § 1491(a)(1) grants the Claims Court jurisdiction over implied contract lawsuits, while § 1491(a)(3) gives the Claims Court the power to grant equitable relief. It baffles me how one can have jurisdiction over a case but not the power to resolve it. The Supreme Court has said:
[W]hen the court has jurisdiction, it has power to decide the case brought before si*
Industrial Addition Association v. Commissioner, 323 U.S. 310, 313, 65 S.Ct. 289, 291, 89 L.Ed. 260 (1945). See also Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939).
In line with its jurisdiction/power dichotomy, the majority contends that § 1491(a)(1) gives jurisdiction to the Claims Court of all implied contracts and that the procedures set out in Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970), should apply to all such contracts. Thus, it argues § 1491(a)(3) cannot and should not be interpreted to require that a claim be brought to a contracting officer prior to institution of a law suit since Keco did not require such a claim. See majority at n. 8 and accompanying text, supra. The fallacy with the majority’s argument lies with its failure to appreciate prior government contract law. Prior to the Contract Disputes Act of 1978, Pub.L. 95-563, 92 Stat. 2383, 41 U.S.C. §§ 601-613 (Supp. V 1981) (the “CDA”), all breach of contract suits, including Aeco-type suits, were brought directly to court without first exhausting administrative remedies.[4] The CDA was promulgated to provide one, uniform system for a contractor to pursue his claims. It was the CDA that introduced the requirement that a “claim” be brought first to a contracting officer in breach of contract cases. Since § 1491(a)(3) was enacted subsequent to the CDA, it must be interpreted in light of that Act and not prior case law, discussed infra.
I
The majority, as well as the Claims Court, construes the phrase “any contract claim brought before the contract is awarded” [emphasis added] to mean a lawsuit filed in the Claims Court. I, however, construe the word as merely an assertion of a right, a claim or bid protest brought to the attention of the contracting officer. The word “claim” has been interpreted numerous ways depending upon how the legislative scheme was meant to operate. See, e.g., Grumman Aerospace Corp. v. United States, 579 F.2d 586 (Ct.Cl.1978); O’Brien Gear & Machine Co. v. United States, 591 F.2d 666 (Ct.Cl.1979); Hageny v. United States, 570 F.2d 924 (Ct.Cl.1978). The majority concedes that the word “claim” can be ambiguous in meaning when standing alone, yet holds that when read in light of §§ 1491(a)(1) and (a)(2) and other unrelated statutes its intended meaning as an “action” or “lawsuit” becomes clear.[5] Despite the majority’s contention, “claim” is often not synonymous with “action” or “lawsuit.” *1381 See, e.g., 28 U.S.C. §§ 1330(a), 1335(b), 1338(b), 1346(b), 1346(c), 1407(a), and 1498(a). Yet, the historic legal meaning of the word “claim” as used against the Government was “a demand for money or for some transfer of public property.” United States v. McNinch, 356 U.S. 595, 599, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001 (1958). At its most basic a claim is simply an assertion of a right. As Judge Nichols states in his concurring opinion at p. 1377, “the obvious repeated meaning of the word ‘claim’ in the original Tucker Act of 1887, 24 Stat. 505, included a demand for money accrued but not yet pursued in a lawsuit.”[6]
Looking for guidance to §§ 1491(a)(1) and (a)(2) therefore does not resolve the ambiguity of the word “claim” as the majority would like us to think. “Claim” can reasonably be understood to just as easily mean the assertion of a right against the Government rather than a lawsuit. The ambiguity remains.
II
Since the phrase “any contract claim brought before the contract is awarded” and in particular the word “claim” are ambiguous, other considerations must be examined. “In expounding a statute, we must not be guided by a single sentence or members of a sentence, but look to the provisions of the whole law, and to its object and policy.” NLRB v. Lion Oil Co., 352 U.S. 282, 288, 77 S.Ct. 330, 333, 1 L.Ed.2d 331 (1957). One consideration is the statute’s legislative history.
The majority’s seemingly lengthy exposition of legislative history falls into the trap that Chief Judge Jones so wisely cautioned against, that “[a]n explanatory tale should not wag a statutory dog.” A.P. Green Export Co. v. United States, 284 F.2d 383, 386, 151 Ct.Cl. 628 (Ct.Cl.1960). The majority’s undue reliance in its examination of the legislative history is upon the use of one word, “action.” That word is construed by the majority to have the same meaning as the word “claim” in the Act. Moreover, the majority at p. 1372, states:
In short, the legislative history indicates that the Senate and House Reports used the terms “action” and “claim” interchangeably, as both Houses have often done. In this instance, Congress intended that both refer to contract actions brought in the Claims Court prior to award.
I, however, fail to find any indication that Congress intended to equate “action” with “claim.” If Congress had wished to do so, an explicit statement to this effect in the legislative history should have been present. Moreover, it is certainly strange that the statute itself speaks only of the word “claim,” whereas the legislative history makes no mention whatsoever of the word “claim.” It must be remembered that it is the statutory language itself that is the lodestar in statutory interpretation. United States v. Erika, Inc., 456 U.S. 201, 205, 102 S.Ct. 1650, 1653, 72 L.Ed.2d 12 (1982). Most importantly, if Congress had wished to place time limitations on filing suits for injunctive or declaratory relief, it certainly could have said so.
The majority claims that the adoption of § 1491(a)(3) was at the instigation of the Justice Department and cites that letter accordingly. What the majority fails to tell us is that § 1491(a)(3) was not the position advocated by the Justice Department, nor does it in any way resemble the Justice Department’s position. What the Justice Department advocated was that the Claims Court be given absolutely no equitable powers in government contract cases. Hearings on H.R. 2405 Before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 1st Sess. 212-13 (1981).[7] Since Congress did not adopt the *1382 Administration’s position, these excerpts from the letter are no more elucidating than other statements made at the House hearings. The Justice Department letter was but one of at least 39 letters received by that subcommittee on the pending legislation; there is simply no basis to accord it the weight given by the majority. Nowhere in the legislative history is there any rationale given nor any proposal made that the injunctive powers given to the Claims Court should be dependent upon the time at which a suit is filed. I certainly cannot think of one. The majority’s rationale of less judicial interference in government contracting administration is a false one.[8] A government contractor is able to circumvent this concern simply by filing a suit post-award in the district court.
Certain critical statements of the legislative history, although quoted by the majority, are simply ignored in its analysis. Senator Dole in pertinent part said:
The fact that the Court of Claims lacks the authority to grant injunctive or declaratory relief to parties that seek its assistance has also been a major problem for litigants in Government contract cases, and has been decried by many practitioners as a glaring defect in its structure.
* * * * * *
In addition, section 133 of the bill gives the new Claims Court the power to grant declaratory judgments and give equitable relief in controversies within its jurisdiction. This provision will for the first time give the court specializing in certain claims against the Federal Government the ability to grant litigants complete relief. The committee concluded that this provision will avoid the costly duplication in litigation presently required when a citizen seeks both damages and equitable relief against the Government.
127 Cong.Rec. S14,692-94 (daily ed. Dec. 8, 1981). This last statement regarding section 133 of the bill was also made in the Senate Committee Report. S.Rep. No. 97-275, 97th Cong., 1st Sess. 22, reprinted in 1982 U.S.Code Cong. & Ad.News 32.
It is clear these statements are in reference to § 1491(a)(3), the only new grant of equitable powers to the Claims Court. The Court of Claims had jurisdiction of bid protest cases for purposes of granting monetary relief for many years. Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970). Such cases were only brought post-award. Since Reco-type cases are within the Claims Court’s jurisdiction, it would seem that the Senate Report and Senator Dole say that the court will now be empowered to grant not only monetary but equitable relief in these cases. The portions of the Senate Report and Senator Dole’s statements that the majority relies upon would then refer to the pre-award situation, a situation not met in the Keco line of cases. Thus, under this view § 1491(a)(3) would cover both pre and post-award bid protests. On the other hand, these references to broad equitable powers are similar to those in the earlier unadopted *1383 version of the bill. See majority opinion at p. 1369. If these statements do refer to the earlier version of the bill, great doubt is thus cast upon the weight to be given the legislative history of the Act. In conclusion, the legislative history does not clarify the meaning of § 1491(a)(3) but instead raises more questions.
Ill
As demonstrated, the majority’s approach has failed to resolve the question as to the meaning of the words “contract claim.” When the meaning of words in a statute is ambiguous, it is necessary to interpret that meaning in light of the statute’s purpose and intent. As the Supreme Court said in District of Columbia v. Carter, 409 U.S. 418, 420, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973):
[W]ords generally have different shades of meaning, and are to be construed if reasonably possible to effectuate the intent of the lawmakers; and this meaning in particular instances is to be arrived at, not only by a consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed. [Citations omitted].
As previously stated, the purpose of the Act is to improve the administration of government contract law, to improve the quality óf our court system and to enhance citizen access to justice. See text at n. 2 and n. 3, supra. This purpose can be effectuated and any ambiguity in the meaning of the word “claim” eliminated when § 1491(a)(3) is read in pari materia with the Contract Disputes Act of 1978. The Court in Erlenbaugh v. United States, 409 U.S. 239, 243-44, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972), stated:
The rule of in pari materia — like any canon of statutory construction — is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context. Thus, for example, a “later act can ... be regarded as a legislative interpretation of [an] earlier act ... in the sense that it aids in ascertaining the meaning of the words as used in their contemporary setting,” and “is therefore entitled to great weight in resolving any ambiguities and doubts.” United States v. Stewart, supra, [311 U.S. 60] at 64-65 [61 S.Ct. 102 at 105, 85 L.Ed. 40]. See also, e.g., Hunter v. Erickson, 393 U.S. 385 [89 S.Ct. 557, 21 L.Ed.2d 616] (1969); United States v. Freeman, supra, [44 U.S. 556] at 565 [11 L.Ed. 724], The rule is but a logical extension of the principle that individual sections of a single statute should be construed together, [footnote omitted] for it necessarily assumes that whenever Congress passes a new statute, it acts aware of all previous statutes on the same subject, cf. Allen v. Grand Central Aircraft Co., 347 U.S. 535, 541-552 [74 S.Ct. 745, 748, 98 L.Ed. 933] (1954). [Emphasis added].
Since there are explicit references to the CDA in both the Act (e.g., § 1491(a)(2)) and its legislative history, it is clear the drafters of the Act had the CDA before them when they drafted the portions of § 1491 regarding government contract litigation. Moreover, the use of the word “exclusive” in § 1491(a)(3) indicates that Congress had the CDA before it when the Act was drafted. The Senate stated:
Since the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to the last sentence of section 8(d) of the Contract Disputes Act. [41 U.S.C. § 607(d)]
S.Rep. 97-275, 97th Cong., 1st Sess. 23, reprinted in 1982 U.S.Code Cong. & Ad.News 33. Similarly, the House stated:
This enlarged authority [declaratory and injunctive powers] is exclusive of the Board of Contract Appeals and not to the exclusion of the district courts. [Emphasis added].
H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 43 (1981). As construed by the majority, the word “exclusive” means that boards of contract appeals are excluded from granting declaratory and injunctive relief. Since boards of contract appeals are not men *1384 tioned in the Act, we must assume, correctly, that Congress had the CDA before it when the “exclusive” language was drafted. Congress therefore must have also considered the CDA when the “contract claim” language was drafted, since these words are in the same subsection (§ 1491(a)(3)) separated by only a comma:
To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper * * *. [Emphasis added].
Since both the Act and the CDA deal with the same subject matter, government contract litigation, and use the word “claim,” it is obvious the drafters of the Act intended to use the word “claim” as it is used in the CDA.
Under the CDA, “claims” are required to be submitted to contracting officers, not to boards or courts. 41 U.S.C. § 605. Section 605 in pertinent part states:
All claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision. All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer.
******
The contracting officer’s decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter. [Emphasis added].
Thus, reading the Act in pari materia with the CDA, it is clear the Act’s reference to “any contract claim brought before the contract is awarded” is a reference to pre-award claims submitted to the contracting officer. Although the confusion over the jurisdictional grant of § 1491(a)(3) is brought about by the use of the term “contract claim” instead of the more popular term “bid protest,” the confusion is readily resolved by examining the meaning of “contract claim” in its proper context. Otherwise, the jurisdictional grant of equitable and declaratory powers under § 1491(a)(3) becomes meaningless. In other words, the use of “any contract claim” is an all-inclusive disputes term which is intended to include “bid protest claim.” This interpretation conforms to the CDA’s use of the word “claim,” meaning all types of disputes decided by a contracting officer. Since “all claims” under the CDA must be referred to the contracting officer, and since the Act refers to “any claim,” it is logical that “any claim” under the Act includes bid protest claims submitted to the contracting officer prior to award.
Moreover, sections 606 through 608 of the CDA state that boards render decisions on “appeals” from the decisions of contracting officers. It is also clear from § 609 of the CDA that the Claims Court renders decisions on “actions” or “suits” “filed” at the court.[9] The use of the word “brought” together with the word “claim” is another signal of Congressional intent. A “contract claim” cannot be “brought” in the Claims Court; rather, an “action” or “suit” on a “claim” may be “filed” before the Claims Court. A “filing” fee must be paid to institute suit in the Claims Court. It is corn- *1385 monly understood in the government contract litigation field that “claims” are “submitted” or “brought” before “contracting officers”; “appeals” are “filed” with boards; and “suits” or “actions” are filed with the Claims Court. The absence of the words “suit,” “action,” or “filing” in § 1491(a)(3) indicates the legislative intent to give equitable jurisdiction to the Claims Court over bid protest claims brought to the attention of the contracting officer prior to award. It is presumed that Congress used the word “claim” in its usual and well-settled sense. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940).
While the boards and the Claims Court hear cases involving “claims,” all claims under the CDA must first be submitted to the contracting officer prior to resolution of the disputes by a board or the Claims Court. Therefore, using the doctrine of in pari materia, the phrase “contract claim brought before the contract is awarded” in the Act does not refer to “actions” or “suits” “filed” before award, but rather, refers to bid protest claims submitted by a disappointed bidder to the contracting officer prior to the award of the contract. In conclusion, interpretation of the statutory language of the Act is unambiguous when read in pari materia with the CDA and leads to a logical result.
IV
Senator Dole and Congress recognized and sought to resolve the problem of bifurcated relief faced by government contractors. See text at pp. 1371-1372, supra. Thus viewed in its proper context, the legislative history supports the view that Congress intended to augment the existing jurisdiction over money claims involving government contracts[10] by including declaratory and injunctive powers.[11]
The legislative history of § 1491(a)(3) makes numerous references to Scanwell -type litigation and the Scanwell Doctrine. Thus, the phrase “any contract claim brought before the contract is awarded” is a descriptive term of that doctrine as it has evolved in the district courts. Under the Scanwell Doctrine, a disappointed bidder generally makes an initial notification or bid protest to the contracting officer before the subject contract is awarded. An injunc-tive action may then be filed before or after the contract has been awarded. Thus, the statutory phrase “any contract claim brought before the contract is awarded” is *1386 a formal description of bid protest claims. See majority at n. 11, supra. Since the Scanwell case involved post-award court intervention after bid protest claims were brought to the contracting officer prior to award,[12] my interpretation is in harmony with the legislative intent, as well as the language of the Act. The majority view conflicts with the Scanwell Doctrine as referred to in the legislative history.
V
The Court, in United States v. American Trucking Associations, 310 U.S. 534, 543, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940), stated:
There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one “plainly at variance with the policy of the legislation as a whole” this Court has followed that purpose, rather than the literal words.
My interpretation permits review of bid protest claims by the Claims Court as long as the protest was brought to the contracting officer prior to the award of a contract. The majority’s interpretation, on the other hand, leads to an absurd result, or, as Judge Nichols states in his concurrence, a “zany scheme.” The majority’s interpretation is illogical in that bid protest claims may be decided by the Claims Court before the contracting officer can render a decision on the claim. The Claims Court will thus be thrust into the position of replacing the contracting officer in deciding bid protests.
Under the majority view, a bid protestor cannot prudently wait for a contracting officer’s decision on the protest and/or cannot safely assume that there will be enough time once the contracting officer’s decision on the protest is rendered. Thus, the majority view necessitates the filing of a protective injunctive action by a bid protestor prior to any decision on the protest by the contracting officer. Otherwise, as occurred in the instant appeal, an award can be made by the contracting officer prior to rendering a decision on the protest, or shortly after rendering the decision on the protest, thereby precluding injunctive action in the Claims Court. This result creates an absurd “race to the courthouse” by bidders in order to invoke the Claims Court’s jurisdiction; even the bidder who subsequently wins the contract may file a suit to protect itself. This will create a flood of premature litigation. In addition, the majority’s interpretation, requiring the filing of an “action” before award, effectively undermines the contracting officers’ present role in making decisions on bid protests. Such a result is neither necessary nor mandated by a reasonable reading of the Act.
VI
In summary, the word “claim” in § 1491(a)(3) does not mean “lawsuit” or “action,” but rather the assertion of a right before the contracting officer. My interpretation is consistent with the meaning of the word “claim” as it is used in the CDA and in government contract litigation. It is obvious the reasonable intent of the statute is to give the Claims Court jurisdiction over bid protests which have been brought to the attention of the contracting officer before award.

. Although the majority has rejected the Government’s argument that the Act precludes granting of injunctive relief by district courts in bid protest cases, I have a few observations regarding its argument. In Scanwei/-type cases, post-award bid protests are common; and district courts are permitted to grant in-junctive relief. See Opal Manufacturing Co. v. United States Postal Service, 553 F.Supp. 131 (D.D.C.1982). The Government, however, argues that in bid protest cases, one, injunctive relief is available only before award at the Claims Court, and two, injunctive relief after award is not available at all. This argument, if accepted, closes injunctive relief to bidders of negotiated and “award upon bid opening” type of contracts.
In recent years procurement by negotiation, as permitted by 10 U.S.C. §§ 2301-2314 (Supp. V 1981), has become prevalent and substantial portions of defense procurement have been obtained in this fashion. The Government did acknowledge at oral argument that procurement by negotiation is the prevalent procurement method. For example, in Fiscal Year 1976, the dollar amount of public advertised (such as the instant appeal) and negotiated contracts awarded were:
Civilian Agencies Defense Agencies
Advertised $ 3,635,381,000 $ 3,232,425,000
Negotiated $12,366,752,000 $37,493,765,000
1 R. Nash & J. Cibinic, Federal Procurement Law 317 (3d ed. 1977). See generally IB J. McBride & T. Touhey, Government Contracts, ch. 9 (1981 and Supp.1982). Since the Government’s negotiations with all bidders are secret, no bidder can possibly have knowledge or notice of irregularities to warrant filing a bid protest prior to award. If one is to follow the Government’s reasoning, a negotiated-type bidder has no forum which can grant him injunc-tive relief. •

. H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 17 (1981).

. S.Rep. No. 97-275, 97th Cong., 1st Sess. 1, reprinted in 1982 U.S.Code Cong. & Ad.News 11.

. The Senate Report of the CDA, S.Rep. No. 95-1118, 95th Cong., 2d Sess. 3, reprinted in 1978 U.S.Code Cong. & Ad.News 5237, said in pertinent part:
III. Background and Need for Legislation * * * * * *
Direct Access to the courts is limited to so-called breach of contract claims, and the agencies can, and do, circumscribe such access by terms and conditions in contracts that are not, in general, subject to negotiation. In other words, a contractor has little choice in the matter.
In large part, the present Government contract remedies system has developed in an unplanned manner. Many of the rules and requirements that govern the system are the result of unstructured reactions to various events and decisions.

. It is interesting to note that on the one hand the majority says that the argument “[tjhat the word ‘claim,’ standing alone, is ambiguous because it has been used with different meanings in different statutes, is true but unavailing;” yet on the other hand it cites unrelated statutes, 28 U.S.C. §§ 1495-1497, 1499, and 1346(a)(2), for support of its interpretation of the word “claim.”

. Under 28 U.S.C. § 2415 and 31 U.S.C. §§ 231-235 the very same demands for money that the majority says require a petition under § 1491 are claims from the date of their inception in an invoice or other document.

. The Department of Justice letter (from Acting Assistant Attorney General Michael W. Dolan) in pertinent part stated:
*1382 As noted, the bill would vastly broaden the equitable power of the Article I Claims Court judges by authorizing them to enter declaratory judgments and grant injunctive relief. In our view, this vast expansion of power would drastically alter the nature of the Government’s waiver of sovereign immunity and could lead to serious and untoward disruptions in the award and administration of Government contracts.
sic s}s S§C $ $
We therefore strongly recommend the adoption of the following amendment, which would maintain — but not expand — the existing powers of the Court of Claims:
On page 24, line 22, strike “to read as follows:” and everything following thereafter through page 26, line 12, and insert in lieu thereof:
by striking out “Court of Claims” the first place it appears and inserting in lieu thereof “United States Claims Court” and by striking out “Court of Claims” each other place it appears and inserting in lieu thereof “Claims Court”.

. As indicated in the Justice Department letter, the Government’s concern was not just with the administration of government contracts but also with judicial interference in the award of government contracts. There is no question that under the majority’s view, § 1491(a)(3) permits judicial interference in the award of contracts.

. Section 609(a) in pertinent part states:
(1) Except as provided in paragraph (2), and in lieu of appealing the decision of the contracting officer under section 605 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.
(2) In the case of an action against the Tennessee Valley Authority, the contractor may only bring an action directly on the claim in a United States district court pursuant to section 1337 of title 28 notwithstanding any contract provision, regulation, or rule of law to the contrary.
(3) Any action under paragraph (1) or (2) shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed de novo in accordance with the rules of the appropriate court. [Emphasis added].

. Such money claims involving government contracts include suits concerning violations of implied contracts. See 41 U.S.C. § 602; Keco Industries, Inc. v. United States, 428 F.2d 1233, 192 Ct.Cl. 773 (Ct.Cl.1970); Heyer Products Co. v. United States, 140 F.Supp. 409, 135 Ct.Cl. 63 (Ct.Cl.1956).

. H.R.Rep. No. 97-312, 97th Cong., 1st Sess. 43 (1981) in pertinent part states:
The new section 1491(a) does give the new Claims Court the augmented power to grant declaratory judgments and give equitable relief in contract actions prior to award. This enlarged authority is exclusive of the Board of Contract Appeals and not to the exclusion of the district courts. It is not the intent of the Committee to change existing caselaw as to the ability of parties to proceed in the district court pursuant to the provisions of the Administrative Procedure Act in instances of illegal agency action. See, e.g., Scan-weli Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970).
Similarly, S.Rep. No. 97-275, 97th Cong., 1st Sess. 23, reprinted in 1982 U.S.Code Cong. & Ad.News 33 in pertinent part states:
By conferring jurisdiction upon the Claims Court to award injunctive relief in the pre-award stage of the procurement process, the Committee does not intend to alter the current state of the substantive law in this area. Specifically, the Scanwell doctrine as enunciated by the D.C. Circuit Court of Appeals in 1970 is left in tact [sic]. See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir. 1970) Moreover, the Committee expects that the court will utilize the authority conferred upon it by this section only in circumstances where the contract, if awarded, would be the result of arbitrary or capricious action by the contracting officials, to deny qualified firms the opportunity to compete fairly for the procurement award. The Committee intends the court to take care not to delay or prevent the award of contracts for goods or services which relate to the national defense or security.
Since the court is granted jurisdiction in this area, boards of contract appeals would not possess comparable authority pursuant to the last sentence of section 8(d) of the Contract Disputes Act. [Emphasis added].

. Other cases involving the Scanwell situation include William F. Wilke, Inc. v. Department of the Army, 485 F.2d 180 (D.C.Cir.1973); Ainslie Corp. v. Middendorf, 381 F.Supp. 305 (D.Mass. 1974); Cincinnati Electronics Corp. v. Kleppe, 509 F.2d 1080 (6th Cir.1975); Collins & Co. v. Claytor, 476 F.Supp. 407 (N.D.Ga.1979); Robert E. Derecktor of Rhode Island, Inc. v. Goldschmidt, 506 F.Supp. 1059 (D.R.I.1980).